**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARY HOLOCHECK** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **3:CV-04-2082** |
| | : | **(JUDGE VANASKIE)** |
| **LUZERNE COUNTY HEAD START, INC.,** | : | |
| **LYNN EVANS BIGA, Individually and as** | : | |
| **Executive Director of Luzerne County** | : | |
| **Head Start, Inc., MARION SOD,** | : | |
| **Individually and as Manager of the** | : | |
| **Nanticoke and Plymouth Centers of** | : | |
| **Luzerne County Head Start, Inc.** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the Court in this employment discrimination action is a Motion for Summary Judgment filed by Defendants Luzerne County Head Start, Inc. ("Head Start"), Lynn Evans Biga, and Marion Sod (collectively "Defendants").  (Dkt. Entry 35.)  Plaintiff Mary Holocheck alleges that Defendants terminated her employment with Head Start on account of age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951-963.  This Court has jurisdiction over the ADEA claim pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 626(c)(1), and supplemental jurisdiction over the PHRA claim pursuant to 28 U.S.C. § 1367(a). For the reasons that follow, Defendants' summary judgment motion will be granted in part and denied in part.

I. **BACKGROUND**

    **A. Factual Background**

        Ms. Holocheck was hired by Head Start on September 4, 1984, as a teacher's aide, a position she held until 1988, when she became a teacher. (Defs.' Statement of Material Facts ("Defs.' SMF"), Dkt. Entry 35-7, ¶ 2.) Ms. Holocheck was a teacher at the Nanticoke Center of Head Start. As part of her duties, Ms. Holocheck was responsible for maintaining the hygiene of the children she taught, which included changing their diapers when necessary. (Dep. of Mary Holocheck ("Holocheck Dep."), Ex. to Pl.'s Mem. of Law in Opp'n to Defs.' S.J. Mot., Dkt. Entry 37-2, at 83, 95.)[1] At the time of her termination in October 2002, Ms. Holocheck was 56 years old. (Compl., Dkt. Entry 1, ¶ 9.)

        Head Start is a non-profit corporation organized pursuant to 42 U.S.C. § 9836. "[Head Start is] a comprehensive family and preschool program for children and families who are of low income or have disabilities," and it provides child care and educational services to these children, who generally are three and four year olds. (Dep. of Lynn Evans Biga ("Biga Dep."), Ex. to Pl.'s Mem. of Law in Opp'n to Defs.' S.J. Mot., Dkt. Entry 37-4, at 11, 13.) At all relevant times, Ms. Biga was the Executive Director of Head Start, and Ms. Sod was the Manager of the Nanticoke Center. (Defs.' SMF ¶ 3.)

---

       [1]Excerpts from Ms. Holocheck's deposition were also submitted as an exhibit by Defendants. (See Ex. B to Defs.' S.J. Mot., Dkt. Entries 35, at 10-20, & Dkt. Entry 35-2.)

Ms. Holocheck's day was divided into a morning session and an afternoon session, with different children in each session.  Ms. Holocheck had two assistant teachers working with her, one for each session.  (Dep. of Susan Petroski ("Petroski Dep."), Ex. to Pl.'s Mem. of Law in Opp'n to Defs.' S.J. Mot., Dkt. Entry 37-3, at 10.)  Her assistant teacher for the afternoon session was Susan Petroski.  (Id. at 10-11.)

At the end of the afternoon session, Ms. Holocheck and Ms. Petroski would retrieve the children's belongings and gather them in a line to prepare for dismissal.  (Holocheck Dep., at 63; Petroski Dep., at 12.)  Many of the children were transported to and from school by bus.  The school bus driver, Jill Viti, would come into Ms. Holocheck's classroom and, with either Ms. Holocheck or Ms. Petroski, would lead the children out to the bus where they were safely buckled into their seats, attendance was taken, and the bus would depart.  (Holocheck Dep., at 63-64; Petroski Dep., at 12-14.)  Ms. Viti was employed by Churnetski Transportation, a business that provides transportation services to Head Start.  (Aff. of Jill Viti ("Viti Aff."), Ex. C to Defs. S.J. Mot., Dkt. Entry 35-3, ¶¶ 2-3; Holocheck Dep., at 66.)

The alleged misconduct that was the basis of Ms. Holocheck's termination occurred on October 3, 2002.  At the conclusion of the afternoon session, Ms. Holocheck and Ms. Petroski were preparing the children for their departure.  Ms. Viti entered Ms. Holocheck's classroom, and she was approached by Ms. Holocheck, who stated: "Austin sh– his pants.  He came in like that and that's the way he's going home."  (Viti Aff. ¶ 4.)  Austin was a student in Ms.

Holocheck's afternoon class.  (Petroski Dep., at 16.)  Ms. Viti said nothing at the time, but instead led the children out to the school bus as she normally would, and departed.  (Id.)

Ms. Holocheck denies that she made this statement to Ms. Viti, (Holocheck Dep., at 64-65), and there is no evidence that Austin actually departed Head Start with soiled pants. Furthermore, Ms. Petroski was present in the classroom when Ms. Viti arrived, and she neither overheard this alleged statement by Ms. Holocheck nor noticed anything unusual about Austin prior to his departure.  (Petroski Dep., 15-17.)

The next day, October 4, 2002, Ms. Viti reported Ms. Holocheck's statement to Sharon Hess, (Viti Aff. ¶ 5.), who informed Ms. Biga and Ms. Sod.  (Holocheck Dep., at 59.)  According to Ms. Holocheck and Ms. Viti, Ms. Holocheck called Ms. Viti around 1:30 p.m. on October 4. (Id. at 75, 77; Viti Aff. ¶ 6.)  Ms. Holocheck had just learned of the allegations against her and wanted to find out what Ms. Viti knew.  (Holocheck Dep., at 75.)  Ms. Viti stated that she "replied that I had not said anything out of fear that [Ms. Holocheck] would retaliate against me in some fashion."  (Viti Aff. ¶ 6.)

Ms. Biga described Ms. Holocheck's alleged misconduct – knowingly placing a child on a school bus with soiled diapers – as a "Class I" offense.  (Biga Dep., at 108.)  Pursuant to the Head Start employee manual, employee misconduct is classified into three grades – "Class I," "Class II," and "Class III" – and a Class I offense is the most serious.  (Id. at 108-09.)

The employee manual enumerates examples of employee misconduct for each of the

4

three categories of offenses, but the list is not exhaustive because Head Start has discretion to discipline employees for misconduct not appearing on the list.  (Id. at 107-08.)  The particular discipline to be meted out for a Class I offense ranges from suspension to termination, and an investigation of the alleged offense is necessary to determine an appropriate punishment.  (Id. at 109-10.)  Ms. Biga is the person ultimately responsible for deciding the appropriate punishment for a Class I offense.  (Id. at 110.)

There is little evidence revealing what, if anything, constituted Ms. Biga's investigation.  The record does indicate that Ms. Petroski was never questioned about the events of October 3, including whether she heard Ms. Holocheck utter the alleged statement to Ms. Viti.  (Petroski Dep., at 15-16.)  Ms. Petroski also testified that Austin's grandmother did not report a problem with Austin to her.  (Id. at 17.)  Furthermore, there is nothing in the record to suggest that Ms. Biga attempted to confirm Ms. Viti's accusation by contacting Austin's grandparents to ask whether he in fact returned home with soiled pants.  Nevertheless, Ms. Biga determined that Ms. Holocheck's alleged misconduct was a Class I offense.  (Biga Dep., at 108.)  As for the appropriate punishment, Ms. Biga consulted with Ms. Sod.  (Id. at 110-11.)  She testified, however, that she did not come to a final decision until October 10, 2002, when she met with Ms. Holocheck.  (Id. at 96.)

Ms. Holocheck was terminated on October 10, 2002, after a meeting with Ms. Biga and Ms. Sod.  (Defs.' SMF ¶ 14; Biga Dep., at 93.)  She was given the opportunity to resign, but

5

refused. (Biga Dep., at 93.) The basis for the termination was "[n]eglect of the children." (Id. at 96.) Ms. Biga felt that sending a child home with soiled pants was neglectful. (Id.) Ms. Holocheck's termination was formally approved at a meeting of the Head Start Board of Directors on October 17, 2002. At the meeting, Ms. Biga identified the basis for termination as "willful neglect of children," although she could not explain what caused her to modify the phrase from "neglect" to "willful neglect." (Id. at 121.)

Ms. Holocheck was replaced by a younger worker, Denise Reimshaw. (Holocheck Dep., at 69.)[2] Ms. Reimshaw was eventually replaced by Joann Stuchur. (Id. at 69-71.) Ms. Holocheck testified that Ms. Stuchur is 22 or 23 years old. (Id. at 72.) However, she has no personal knowledge of Ms. Stuchur's age, but instead based her testimony from what she was told by parents who had children in Ms. Stuchur's class. (Id.)

Irrespective of Ms. Biga's reasons for the termination, Ms. Holocheck believes that she was terminated because of her age. In addition to being replaced by a younger worker, Ms. Holocheck refers to a statement of Ms. Biga, either during the October 10, 2002, meeting, or in a subsequent letter memorializing the termination. (Id. at 43-44.) Ms. Biga stated that, "I ha[d] been in the Nanticoke Center and with Head Start for a long, long time, from when the Nanticoke Center had first opened, and I was one of the older people." (Id. at 43.) Under the

---

[2]Ms. Holocheck indicated in her Sur-reply Memorandum of Law that Defendants acknowledged in an answer to an interrogatory that Ms. Reimshaw was 42 years old at the time. (See Dkt. Entry 40, at 3 n.3.)

circumstances, Ms. Holocheck interpreted this comment as relating to her age, rather than her experience.  (Id. at 43-44.)

Ms. Holocheck identified other comments spoken by Ms. Biga and Ms. Sod.  She could not recall exactly when the comments were made and, in many instances, could not provide the context for a specific remark.  She was certain that the comments occurred within the two-year period prior to her termination.  (Id. at 24.)  Many of the comments are facially neutral and do not concern age.  Some of the remarks, however, do refer to age.  For example, upon returning from summer vacation at the start of the school year, Ms. Biga said, "Nice to see an old timer return."  (Id.)  On another occasion, Ms. Biga noted Ms. Holocheck's new hair color and suggested it was an attempt to conceal her age.  (Id. at 26.)  Ms. Biga also commented, "[G]ee, time is just ticking away for you."  (Id. at 109.)  Ms. Sod made similar remarks.  (See, e.g., id. at 28 ("Are you having a senior moment[?]"); id. at 109 ("[O]ld age is setting in.").)

Ms. Holocheck acknowledged that she was not offended by some of the comments by Ms. Biga and Ms. Sod, nor did she utilize the procedures in the employee handbook to complain about the comments.  (Id. at 27, 33, 94-95.)  She explained that she "loved" her job and was dedicated to working with the children.  (Id. at 27.)  On the other hand, Ms. Holocheck's "feelings [were] hurt" when Ms. Sod asked if she had a problem using the stairs, although this comment appears to be age-neutral.  (Id. at 29.)  She also testified that she never heard Ms. Sod make similar comments to other employees.  (Id. at 110.)

In addition to the comments of Ms. Biga and Ms. Sod, Ms. Holocheck recalled an incident where another teacher, who may or may not have been under the age of forty at the time, (compare id. at 45, with id. at 46), was treated differently in connection with disciplinary action. (See id. at 45-46.) Linda Gittens was a teacher at the Nanticoke Center, where Ms. Holocheck taught. (Id. at 45.) Ms. Gittens had taken her class out for a walk but, unbeknownst to her, had left a child behind unattended on the second floor of the building. (Id. at 45-46.) The child ventured downstairs to Ms. Holocheck's classroom, where the child remained until Ms. Gittens returned with her class. (Id. at 46.) Ms. Holocheck was concerned that the child could have fallen out a window or wandered out the front door of the school building and into the path of oncoming traffic. (Id.) Leaving a child unattended is an enumerated Class I offense. (Biga Dep., at 109.) Ms. Gittens was suspended for one day without pay. (Holocheck Dep., at 46.)

Subsequent to her termination, Ms. Holocheck made no effort (i.e., reading classified ads or making inquiries) to secure substitute employment, either within or outside her field. (Id. at 10-12; Defs.' SMF ¶ 16.) She explained that it would be difficult to obtain another teaching position because of her termination at Head Start. (Holocheck Dep., at 10.) She testified that she would need a reference before any employer would hire her, and she assumed that Head Start would provide a negative reference to a prospective employer. (Id. at 10-11, 85.)

Ms. Holocheck, however, never actually applied for any position, and therefore has no

knowledge of what a potential employer would require, if anything, in terms of references.  (Id. at 10-11.)  Furthermore, Ms. Holocheck could not recall ever being informed by someone associated with Head Start that it would provide a negative reference in response to an inquiry from a prospective employer.  (Id. at 11.)  She also stated that she is not interested in employment outside of teaching because she wants to remain in this particular field, rather than engage in a line of work for which she does not have training or experience.  (Id. at 12.) Additionally, she did not apply for employment outside her field because she assumed those prospective employers would require a reference.  (Id. at 85.)  Once again, she never tested the accuracy of her assumption.  (Id.)  She indicated that she still wants to teach children.  (Id. at 108-09.)

Although Ms. Holocheck did not proactively seek substitute employment, she worked for two to three months over the summer of 2003 for Haystacks.  (Id. at 9-10, 15.)  It appears from the record that Haystacks is a restaurant.  (See id. at 16.)  The hours worked each week varied because she was "on call."  (Id. at 10.)  She testified that she never sought this position; she did not learn of an opening after a search of the classified ads nor did she go to the business itself and inquire about an opening.  (Id. at 15-16.)  Instead, someone, maybe a friend, mentioned to her in a conversation that the friend would be going on vacation and needed to find a replacement.  (Id. at 16.)  The record is clear that the job did not involve teaching or working with children, and Ms. Holocheck was not looking for other employment during her brief tenure

at Haystacks.

In response to Ms. Holocheck's fear about a negative employment reference, Ms. Biga stated that Head Start has a "neutral reference policy."  (Aff. of Lynn Evans Biga in Supp. of Defs.' S.J. Mot. ("Biga Aff."), Dkt. Entry 35, ¶ 7.)  According to Ms. Biga, this means that Head Start "provide[s] dates of employment and title and nothing more absent the prior employee's authorization."   (Id.)  Defendants also submitted a computer printout that purports to list all of the "child care centers in Luzerne County" that employ individuals possessing the same credentials as Ms. Holocheck.  (Id. ¶ 2.; Ex. A to Defs.' S.J. Mot., Dkt. Entry 35.)  The printout, however, does not inform the reader as to its source; its timeliness; the terms, conditions, compensation, and benefits of each position; or whether any of the positions are actually open.

## B. Procedural History

Ms. Holocheck filed a three-count Complaint with this Court on September 20, 2004. (Dkt. Entry 1.)  Count One alleged that Defendants, including Ms. Biga and Ms. Sod, violated the ADEA when they terminated Ms. Holocheck's employment due to her age.  Count Two asserted a related claim under the PHRA arising from the same conduct.  Count Three was brought under 42 U.S.C. § 1983 and alleged that Ms. Holocheck's termination violated her constitutional rights as well rights extended to her by federal regulations.  Defendants filed a motion to dismiss, which the Court granted to the extent of Ms. Holocheck's ADEA claim against Ms. Biga and Ms. Sod and her § 1983 claim, but denied the motion in all other

respects.  (See Memorandum and Order of August 30, 2005, Dkt. Entry 32.)  Defendants have yet to file an Answer to the Complaint.

On October 3, 2005, Defendants filed their summary judgment motion.  (Dkt. Entry 35.) The motion has been fully briefed by the parties, (Dkt. Entries 35-5, 35-6, 37, 38-3, & 40), and is ripe for disposition.

## II. DISCUSSION

### A. Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in

the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Mere conclusory allegations

taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch

v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be

entered "after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317,

322 (1986).

### B. ADEA and PHRA Claims – Liability

Under the ADEA, it is unlawful for an employer "to discharge any individual . . . because

of such individual's age."  29 U.S.C. § 623(a)(1); see also 43 Pa. Stat. Ann. § 955(a) (similar

prohibition under the PHRA).  Where, as here, there is no direct evidence that a termination

was motivated by the employee's age, the Third Circuit applies a slightly modified version of the

familiar McDonnell Douglas v. Green, 411 U.S. 792 (1973), burden-shifting framework.  See

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc); Sempier v.

Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); see also Glanzman v. Metro. Mgmt. Corp.,

391 F.3d 506, 509 n.2 (3d Cir. 2004) (same legal standard applies to claims under the ADEA

and the PHRA).

Under this approach, a plaintiff must first present sufficient evidence to establish a prima

facie case of discrimination.  Sempier, 45 F.3d at 728.  If plaintiff is able to establish a prima

facie case of discrimination, "[t]he burden of production (but not the burden of persuasion) shifts to the defendant." Keller, 130 F.3d at 1108.  The defendant must then offer evidence that is sufficient to support a finding that it had a legitimate, non-discriminatory reason for the discharge.  Id.  If the defendant fails to do so, judgment must be entered for the plaintiff.  If the defendant offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff.  To survive summary judgment, the plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

In this matter, Defendants concede for the purpose of their summary judgment motion that Ms. Holocheck has established a prima facie case of discrimination.  (See Mem. of Law in Supp. of Defs.' S.J. Mot. ("Defs.' Supp. Mem."), Dkt. Entries 35-5 & 35-6, at 10.)  Defendants, therefore, have the burden to articulate a legitimate, non-discriminatory reason for Ms. Holocheck's termination.  In this regard, Defendants submit that Ms. Holocheck was terminated because of an allegation that she sent a child home who had soiled his pants.  Employee misconduct is a legitimate, non-discriminatory reason for terminating an employee.  See, e.g., Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998); Bradford v. Luzerne County, No. Civ. A. 3:02-CV-1389, 2005 WL 2406054, at *3 (M.D. Pa. Sept. 28, 2005).

In order to show Defendants' proffered non-discriminatory reason is a pretext, Ms. Holocheck must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.  Because she makes arguments under both prongs, each will be separately discussed.

### 1) Fuentes – Prong One

The court in Fuentes stated:

> To discredit the employer's proffered reason . . ., the plaintiff cannot simply show that the employer's reason was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

Id. at 765 (internal citations and quotation marks omitted).  In assessing Ms. Holocheck's evidence on this prong, the Court is mindful that "'federal courts are not arbitral boards, ruling on the strength of 'cause' for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" Keller, 130 F.3d at 1109 (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996) (per curiam)).

Ms. Holocheck's principal argument that summary judgment must be denied is the existence of a factual dispute as to whether or not she failed to change a diaper.  (Pl.'s Mem. of Law in Opp'n to Defs.' S.J. Mot. ("Pl.'s Opp'n Mem."), Dkt. Entry 37, at 5.)  She asserts that, because she denies that she failed to change the diaper, and also denies that she made the statement to Ms. Viti about Austin, and because Ms. Petroski testified that she neither heard Ms. Holocheck's alleged statement to Ms. Viti nor observed anything unusual about Austin, summary judgment in favor of Defendants is foreclosed.

Even accepting Ms. Holocheck's version of the events as true, as the Court is obliged to do on summary judgment, this evidence proves only that Defendants made a mistake in terminating Ms. Holocheck.  To avoid summary judgment, however, Ms. Holocheck must go further than simply demonstrating an erroneous assessment on the part of Defendants in terminating her.

In Droutman v. New York Blood Ctr., No. 03-CV-5384 (DRH/ARL), 2005 WL 1796120, at *2 (E.D.N.Y July 27, 2005), plaintiff was terminated for allegedly falsifying an employee attendance sheet.  Plaintiff suggested that someone else may have altered the time sheet.  Id. at *9.  Because there was a factual dispute as to whether the alleged misconduct occurred, plaintiff, like Ms. Holocheck, argued that summary adjudication of the pretext issue was inappropriate.  Id.  The court rejected this contention because, absent discrimination, an employee-at-will can be fired for any reason or no reason.  Id.  The court explained: "An

15

employer's good faith <u>belief</u> that an employee engaged in misconduct is a legitimate reason for terminating her, and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." <u>Id.</u>; <u>see also</u> <u>Andy v. United Parcel Serv.</u>, No. Civ. A. 02-8231, 2003 WL 22697194, at *6 (E.D. Pa. Oct. 24, 2003) ("[T]he Court must look only at the perception of the decision maker, not the plaintiff's own view of his performance."). Therefore, because plaintiff failed to adduce evidence that the decision-maker did not believe the allegation that she falsified her time sheet or did not act upon that belief, plaintiff could not establish a genuine issue of material fact on pretext. <u>Droutman</u>, 2005 WL 1796120, at *9.

    In contrast to <u>Droutman</u>, Ms. Holocheck has offered evidence sufficient to infer that the reason for her termination was not Ms. Viti's statement. Although, Ms. Holocheck does not dispute the fact that Ms. Viti reported her statement about Austin to Head Start, which set in motion the events that ultimately led to her termination, there is no evidence that Ms. Biga or Ms. Sod corroborated the statement. Reliance upon an uncorroborated statement to fire a long term employee who does not have a history of disciplinary problems certainly raises suspicions as to the existence of some other factor motivating the adverse employment decision.

    Ms. Holocheck also contends that Defendants' reason is improbable because failing to change a diaper is not an enumerated offense in Head Start's employee manual, calling into question why she was discharged for conduct not explicitly identified as warranting this extreme sanction. (Pl.'s Opp'n Mem., at 6.) Second, Ms. Holocheck notes that Defendants'

16

characterization of her alleged misconduct as "[n]eglectful behavior," "neglect of children," "willful neglect of children," "jeopardizing a child's life," "conduct that is unfit in terms of watching the children," and "child abuse" are so extreme that a reasonable juror could conclude that the proffered justification is a pretext.  (Id.)  In this regard, it is noteworthy that Defendants have not proffered evidence of a pattern of neglect or abuse on the part of Ms. Holocheck.

Finally, Ms. Holocheck questions the sufficiency of the "investigation" that preceded her firing.  A perfunctory investigation could serve to undermine Defendants' purported good faith in crediting Ms. Viti's statement.  A jury could conclude that Defendants seized upon Ms. Viti's statement in order to get rid of Ms. Holocheck, and not because they truly believed that Ms. Holocheck would allow a child to leave in a soiled diaper.  In this regard, Ms. Holocheck notes that she "has changed hundreds of diapers during her 18 years of working" at Head Start, that it is a regular activity, and, therefore, it is improbable that she would send a child home with a soiled diaper.  (Id.)

In short, Ms. Holocheck has presented sufficient evidence to enable a factfinder to conclude that Defendants' proffered non-discriminatory reason is "unworthy of credence." Consequently, she survives summary judgment on this basis.

### 2) Fuentes – Prong Two

Under the second prong of Fuentes, Ms. Holocheck can defeat summary judgment by presenting evidence from a which a jury might reasonably "believe that an invidious

17

discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.  "In other words, . . . [Ms. Holocheck] must point to evidence that proves age discrimination in the same way that critical facts are generally proved – based solely on the natural probative force of the evidence."  Keller, 130 F.3d at 1111.

Ms. Holocheck argues that age-related comments directed at her by Ms. Biga and Ms. Sod reveal the true reason for her termination.[3]  (Pl.'s Opp'n Mem., at 7.)  Although she could not testify definitively as to when these comments were made, other than one comment by Ms. Biga, she stated that the remarks were made within the two-year period immediately preceding her termination.  (Holocheck Dep., at 24.)

---

[3]Ms. Holocheck also argues that the second prong of Fuentes is met because a similarly situated member of the non-protected class, Linda Gittens, was treated differently in that she received a one-day suspension for leaving a child unattended, an offense Ms. Holocheck insists is more serious.  "The plaintiff has the burden of demonstrating that similarly situated persons were treated differently," and "she cannot selectively choose a comparator."  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)).  "Rather, '[t]o be deemed similarly situated[,] the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 652 (E.D. Pa. 2000) (quoting Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999)) (emphasis added).  Here, Ms. Holocheck and Ms. Gittens are not similarly situated because the conduct that subjected each to discipline is distinguishable.  Moreover, Ms. Holocheck's opinion that Ms. Gittens' conduct was more serious and therefore deserving a harsher sanction has no bearing on the analysis.  See Gazarov ex rel. Gazarov v. Diocese of Erie, 80 Fed. Appx. 202, 206 (3d Cir. 2003) ("The plaintiff may assert a subjective belief that another's behavior is more serious, but unless it is the same conduct as the plaintiff's, the supposedly more serious act by the comparator is irrelevant.").  As such, this evidence does not satisfy Ms. Holocheck's burden under the second prong of Fuentes.

The decision-maker's age-related comments can be probative of her discriminatory attitude towards older employees.[4]  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151-53 (2000); Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214-15 (3d Cir. 1995).  Age-related comments referring directly to the employee that share a nexus with the employment decision at issue are indicative of discriminatory animus.  See Barnes v. Foot Locker Retail, Inc., — F. Supp. 2d —, No. 06-2118-JWL, 2007 WL 716129, at *4-5 (D. Kan. Mar. 9, 2007).  However, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992).  The relevance of ageist comments in determining whether an employer's proffered non-discriminatory reason is pretextual will rest upon the content and context of the comments, in addition to temporal proximity to the termination.  Steward v. Sears, Roebuck & Co., No. Civ. A. 02-8921, 2006 WL 1648979, at *27 (E.D. Pa. June 13, 2006).

Ms. Holocheck has presented evidence of comments that are sufficient to support an inference that discrimination was the real reason behind her termination.  At the time of her termination, Ms. Biga stated that Ms. Holocheck had been at the Nanticoke Center "for a long,

---

[4]It is appropriate to consider both Ms. Biga and Ms. Sod as the decision-makers because Ms. Biga consulted with Ms. Sod.  As such, Ms. Sod was in a position to influence Ms. Biga, and her age-based bias could have motivated the decision.  See Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.").

19

long time" and that she "was one of the older people."  (Holocheck Dep., at 43.)  Although it is

unclear whether Ms. Biga made this or a similar remark at the October 10, 2002, meeting, or

whether it was included in a subsequent termination letter addressed to Ms. Holocheck, (see id.

at 43-44), a reasonable jury could draw an inference of age-based animus.  The comment

cannot be dismissed as a stray remark since it was made in connection with Ms. Holocheck's

termination.  Furthermore, Defendants have never denied that Ms. Biga said this to Ms.

Holocheck.

Ms. Holocheck also testified to other comments by Ms. Biga and Ms. Sod that are

indicative of a possible age-bias, though there is no evidence that the comments were made at

the time Ms. Holocheck's termination was being contemplated.  (See, e.g., id. at 26 (Ms. Biga

commenting on Ms. Holocheck's new hair color and questioning whether it is an attempt to hide

her age); id. at 28 (Ms. Sod: "Are you having a senior moment."); id. at 109 (Ms. Biga: "[G]ee,

time is just ticking away for you."); id. (Ms. Sod: "[O]ld age is setting in.").)  Generally, these

remarks would have limited probative value because they were unrelated to the decision to

terminate Ms. Holocheck.  However, in light of Ms. Biga's comment to Ms. Holocheck at the

time of her termination, the fact that these comments were directed at Ms. Holocheck

specifically, and the fact that Defendants have never denied these comments, the additional

remarks lend further support to the inference that Ms. Biga and Ms. Sod held an age-based

bias against Ms. Holocheck.

Defendants argue that these comments cannot support an inference of discrimination because Ms. Holocheck testified that she was not offended by the comments, nor did she avail herself of procedures in place to complain about the remarks. (Defs.' Supp. Mem., at 11 n.4.) While an employee's reaction to an alleged discriminatory comment may inform the analysis, the crucial inquiry is whether the statement reflects a bias on the part of the speaker. The case of Rader v. WEA Mfg., Inc., No. 3:01-CV-1998, 2003 WL 22454360 (M.D. Pa. Oct. 28, 2003), cited by Defendants, illustrates this principle. There, in an effort to show that the employer's non-discriminatory reason for termination was pretextual, plaintiff presented evidence of a conversation with a supervisor, who asked plaintiff his thoughts about retirement. Id. at *6. When plaintiff responded that he had no intention of retiring, the supervisor was relieved. Id. at *7. The court concluded that an inference of discrimination could not be derived because the supervisor was elated that plaintiff had no plans to retire. Id. Thus, the supervisor's reaction undermined plaintiff's contention that the statement revealed a discriminatory animus. The court pointed out that plaintiff testified that he was not offended by the comment, but this only served to reinforce the court's conclusion. Id. As such, the fact that Ms. Holocheck was not offended by some of the remarks is not dispositive. See Abrams, 50 F.3d at 1214 & n.10 (evidence that plaintiff's supervisor had said "things would begin to hum around here when we get rid of the old fogies" was relevant to whether supervisor harbored a discriminatory animus, even though plaintiff understood "old fogies" to refer to management above the supervisor

rather than employees in general).

In summary, Ms. Holocheck has presented sufficient evidence with respect to the second prong of <u>Fuentes</u> to enable a reasonable fact-finder to conclude that discrimination was more likely than not the reason for her termination.  This is not a case where Defendants have offered overwhelming evidence justifying their decision to terminate Ms. Holocheck.  "Based on the brevity of the record before the Court and viewing the evidence in the light most favorable to the non-moving Plaintiff, the Court finds that Plaintiff has presented some evidence that might permit a jury to believe that Defendant[s'] proffered reasons are . . . a pretext for illegal discrimination."  <u>Houda v. Jupiter Chevrolet</u>, No. Civ. A. 3:05-CV-1418D, 2006 WL 3531286, at *7 (N.D. Tex. Dec. 7, 2006) (plaintiff's evidence that supervisor told him to assist customers of the same age and race shortly before his termination was sufficient to create a triable issue where the only evidence offered by defendant was an affidavit of a witness to the argument between plaintiff and his supervisor and a termination report stating the reasons for termination that was completed by the supervisor).  Consequently, Defendants' motion for summary judgment will be denied.

### B. ADEA and PHRA Claims – Mitigation of Damages

Defendants argue that even if the Court denies their motion for summary judgment as to liability on Ms. Holocheck's age discrimination claims, they are entitled to a determination that Ms. Holocheck's utter failure to seek employment following her discharge precludes back pay

and front pay damages.  (See Defs.' Supp. Mem., at 5-8.)  Ms. Holocheck responds that

Defendants failed to assert the affirmative defense of failure to mitigate in a timely Answer and,

therefore, should be precluded from asserting the defense.  (Pl.'s Opp'n Mem., at 8-9.)  She

alternatively asserts that, even if the Court allows Defendants to raise the defense, summary

judgment should be denied because Defendants have failed to satisfy their burden.  (Id. at 9-

14.)

### 1) The Waiver Issue

Ms. Holocheck filed her complaint on September 20, 2004.  (Dkt. Entry 1.)  Defendants

filed a motion to dismiss on November 23, 2004, seeking to dismiss Count I of the complaint as

to Ms. Biga and Ms. Sod, and Counts II and III with respect to all Defendants.  In a

Memorandum and Order of August 30, 2005, the Court disposed of Defendants' motion to

dismiss.  (Dkt. Entry 32.)  Pursuant to Fed. R. Civ. P. 6(a) and Fed. R. Civ. P. 12(a)(4)(A),

Defendants answer was due no later than ten (10) days (exclusive of weekends and holidays)

from "notice of the [C]ourt's action," or September 14, 2005.  However, Defendants did not file

an Answer on or before September 14, and they have yet to do so.  Instead, Defendants

asserted failure to mitigate as a ground for summary judgment in early October 2005, and,

upon realizing that an Answer had not been filed, included their proposed Answer, with

affirmative defenses, as an exhibit to their Reply Memorandum.  (See Ex. A to Aff. of Phillip

Howard, Dkt. Entry 38.)

23

Failure to mitigate damages is an affirmative defense that must be raised in a responsive pleading – here, an answer – or generally it is waived.  See Fed. R. Civ. P. 8(c); WRS, Inc. v. Plaza Entm't, Inc., Civ. A. No. 00-2041, 2007 WL 587250, at *6 (W.D. Pa. Feb. 20, 2007).  Our Court of Appeals, however, has consistently rejected the notion that the failure to assert an affirmative defense in a responsive pleading "automatically result[s] in a waiver." Eddy v. V.I. Water & Power Auth., 256 F.3d 204, 209 (3d Cir. 2001) (citing Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991)).  To the contrary, a "'defendant does not waive an affirmative defense if [h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'"  Id. (quoting Charpentier, 937 F.2d at 864).  The Court has discretion to permit an untimely affirmative defense, and several factors inform the exercise of this discretion, including whether a defendant's delay was for tactical purposes or any improper reason, and whether plaintiff was prejudiced by the delay.  Id. at 210.

Here, although Defendants have yet to file an Answer, they have asserted the affirmative defense of failure to mitigate damages at a pragmatically sufficient time, and Ms. Holocheck has not demonstrated any prejudice.  Ms. Holocheck was on notice of this defense at her deposition of August 19, 2005.  At that time, Defendants' counsel questioned Ms. Holocheck on matters related to mitigation of damages.

Ms. Holocheck dismisses these questions as "merely exploratory, deposition questions" insufficient to put her on notice.  (Pl.'s Sur-reply Mem. of Law., Dkt. Entry 40, at 2.)  An

24

examination of the deposition testimony, however, belies this contention.  During the

deposition, Defendants' counsel asked Ms. Holocheck on several occasions about her efforts to

obtain employment after she was terminated.  (See Holocheck Dep., at 10, 12, 15-16, 84-85.)

At one point, counsel explicitly asked her whether she was ever told "that you have a

requirement to minimize your losses."  (Id. at 12.)  Furthermore, Defendants filed their motion

for summary judgment on October 3, 2005, asserting the defense of failure to mitigate, which

was only three weeks after their Answer was due.  Therefore, Defendants raised the affirmative

defense at a pragmatically sufficient time.

Moreover, Ms. Holocheck has not shown prejudice on the issue of whether she failed to

mitigate her damages due to Defendants' inaction.  Ms. Holocheck claims prejudice because

she was unable to conduct adequate discovery on this issue.  (Pl.'s Opp'n Mem., at 8-9; Pl.'s

Sur-reply Mem. of Law., at 2.)  Notably, however, the mitigation defense generally focuses on

the plaintiff's efforts to obtain alternative employment.  Ms. Holocheck argues that Defendants

have not identified a single witness – lay or expert – or a single document regarding mitigation,

either in their Fed. R. Civ. P. 26 initial disclosures or in response to discovery requests.  (Pl.'s

Opp'n Mem., at 8-9; Pl.'s Sur-reply Mem. of Law., at 2.)  Such evidence, however, is not

essential.  Defendants are relying largely on Ms. Holocheck's deposition testimony to support

their defense.  Moreover, there is no evidence that Defendants delayed asserting this

affirmative defense for an improper purpose or otherwise acted in bad faith.  Consequently, the

Eddy factors weigh in favor of permitting Defendants to assert this affirmative defense.[5]

There is, however, one aspect of the mitigation defense presented here on which Ms. Holocheck is arguably prejudiced by its late assertion: the extent to which a back pay award should be reduced.  Our Court of Appeals has held that a failure to mitigate does not necessarily foreclose some back pay award.  See Booker v. Taylor Milk Co., 64 F.3d 860, 866-67 (3d Cir. 1995).  Even where there is a failure to mitigate, there still remains the question of whether the plaintiff could have earned as much in post-discharge employment as she was making with the alleged wrongdoer.  Id.  The late assertion of the mitigation defense here arguably precluded Ms. Holocheck from marshaling evidence on the question of whether alternative early childhood educational employment opportunities would have been less

_____

[5]Ms. Holocheck cites two cases outside the Third Circuit to support her argument that Defendants are barred from asserting that she failed to mitigate damages.  In Davignon v. Clemmey, the Court of Appeals for the First Circuit held that the district court abused its discretion in allowing the defendant to raise the defense of res judicata for the first time on the eighth day of a nine-day trial.  322 F.3d 1, 15 (1st Cir. 2003).  The court, however, recognized that cases allowing "the interposition of an affirmative defense outside the pleadings generally have involved moderate delays, such as an attempt to raise the defense in a pretrial motion to dismiss or for summary judgment."  Id. at 16 (emphasis added).  Unlike Davignon, this case involves a "moderate delay."

In Harris v. Sec'y, U.S. Dep't of Veteran Affairs, 126 F.3d 339, 341 (D.C. Cir. 1997), the court held that Fed. R. Civ. P. 8(c) requires affirmative defenses to be raised for the first time in a responsive pleading, rather than a dispositive motion.  In so holding, the court rejected the approach of other circuits, including the Third Circuit, that permit a party to raise an affirmative defense for the first time in a dispositive motion in the absence of prejudice.  Id. at 344 (citing Kleinknecht v. Gettysburg Coll., 989 F.2d 1360, 1374 (3d Cir. 1993)).  Harris, of course, is inconsistent with the controlling precedent in this circuit.

remunerative than her position with Head Start.  Thus, while the issue of failure to mitigate <u>vel non</u> is properly before the Court, any judgment as to whether some back pay award is warranted will be deferred until the time of trial.

 In summary, the issue of mitigation of damages was raised at a pragmatically sufficient time.  Ms. Holocheck, however, has shown that she may have been prejudiced on the question of the extent to which a back pay award should be reduced, precluding adjudication of this issue at this time.

### 2) The Merits

 "The purpose of awarding damages in employment discrimination cases is to make the victim 'whole for injuries suffered on account of unlawful employment discrimination.'" <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 54 (2d Cir. 1998) (<u>quoting</u> <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 418 (1975)).  Consistent with this purpose, "[t]he Supreme Court has instructed that 'given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of [the employment discrimination laws].'" <u>Booker</u>, 64 F.3d at 866-67 (<u>quoting</u> <u>Albemarle Paper</u>, 422 U.S. at 421).  Thus, while there is "a presumption in favor of a back pay award," <u>id.</u> at 864, an employer is not liable for damages attributable to the victim's failure to mitigate her lost earnings, or that "may be the result of losses willfully incurred by the plaintiff."  <u>Meyer v. United Air Lines, Inc.</u>, 950 F. Supp. 874, 877 (N.D. Ill. 1997).

As a general rule, the employer has the burden to prove that plaintiff failed to mitigate her damages.  Caufield v. Center Area Sch. Dist., 133 Fed. Appx. 4, 10 (3d Cir. 2005); Booker, 64 F.3d at 864.  Where the employer sustains its burden to prove plaintiff's failure to mitigate damages, "any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front-pay award will be foreclosed." Caufield, 133 Fed. Appx. at 11.

An employer must ordinarily demonstrate two elements to establish failure to mitigate: (1) substantially equivalent work was available, and (2) plaintiff did not exercise reasonable diligence to obtain the available employment.  Booker, 64 F.3d at 864 (citing Anastasio v. Schering Corp., 838 F.2d 701, 708 (3d Cir. 1988)).  "'Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the [ADEA] claimant has been discriminatorily terminated.'"  Id. at 866 (quoting Sellers v. Delgado Coll., 902 F.2d 1189, 1193 (5th Cir. 1990)).

Applying this test, Defendants are not entitled to summary judgment.  Defendants have not presented competent evidence that substantially equivalent employment was available.  In this respect, the computer printout purporting to list all of the "child care centers in Luzerne County" that employ individuals with Ms. Holocheck's credentials is inadequate.  The four-page computer printout merely provides the name and address of child care centers in Luzerne

28

County, without any indication of the "promotional opportunities, compensation, job responsibilities, working conditions, and status" necessary to gauge whether these positions are "virtually identical" to Ms. Holocheck's teaching position at Head Start.  The computer printout does not even disclose whether any of the child care centers were actually hiring during the period following Ms. Holocheck's termination.  Defendants attempt to prove this element with Ms. Biga's affidavit is likewise insufficient.

      Defendants also argue, however, that where the plaintiff has completely withdrawn from the labor market, an employer-defendant need not show substantially equivalent employment. Defendants' position is based on the concept of a "willful loss of earnings" first applied in National Labor Relations Act ("NLRA") cases to foreclose back pay awards.  See, e.g., Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 198 (1941).  As stated in NLRB v. Ferguson Elec. Co., 242 F.3d 426, 434 (2d Cir. 2001), "[i]t is well settled that backpay is not available to an employee who has suffered a willful loss of earnings."  This rule has been applied in the context of employment discrimination cases.  See, e.g., Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005); Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1168-69 (6th Cir. 1996); Hunter v. Allis-Chalmers Corp., Engine Div., 797 F.2d 1417, 1428 (7th Cir. 1986); Sangster v. United Air Lines, Inc., 633 F.2d 864, 867-68 (9th Cir. 1980).  As the Ninth Circuit recognized, denial of back pay and front pay would not frustrate the remedial purposes of the anti-discrimination laws where the victim effectively caused the loss by withdrawing from the

labor market.  633 F.2d at 868.

Although it does not appear that the Third Circuit has addressed the "willful loss of earnings" principle in a precedential opinion in the context of an employment discrimination case, it has applied the rule to foreclose back pay in the NLRA setting.  In Tubari, Ltd. v. NLRB, 959 F.2d 451, 452-52 (3d Cir. 1992), our Court of Appeals reviewed an order of the NLRB awarding back pay to the discriminatees as a consequence of the employer's violation of the NLRA.  The NLRB, although reducing the back pay award by amounts earned by the discriminatees for picketing activities, held that the discriminatees' failure to seek comparable employment did not preclude an award of back pay for the net loss of earnings.  Id.  Beyond the picketing activities, it was undisputed that the discriminatees did not search for interim employment.  Id. at 453.  The employer argued that the discriminatees were not entitled to any back pay because they completely failed to search for suitable interim employment.  Id.  The Court of Appeals agreed, explaining that acceptance of lower paying work may fulfill one's duty to mitigate damages, but only after the worker has made, or was in the process of making, reasonably diligent attempts to secure substantially equivalent employment.  Id. at 459.  In Tubari, it was undisputed that the discriminatees made no such attempts.  The court recognized that an employer generally has the burden to present evidence that substantially equivalent work was available.  Significantly, however, the court held that such evidence is not relevant where the employer shows that "the discriminatees made no search for comparable

interim employment." Id.  Furthermore, "if the employee has exercised no diligence whatsoever 'the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant.'" Id. at 454 (quoting NLRB v. Madison Courier, Inc., 472 F.2d 1307, 1319 (D.C. Cir. 1972)).

The willful loss of earnings rule was acknowledged to be applicable in the employment discrimination context by our Court of Appeals in a non-precedential opinion.  See Caufield, 133 Fed. Appx. at 11 (employer may establish failure to mitigate by showing that employee "withdrew entirely from the employment market," citing Tubari).  Moreover, the applicability of the willful loss of earnings rule in the age discrimination context was recognized in Wooley v. Colonial Sch. Dist., Civ. A. No. 91-407 (MMS), 1993 WL 431208, at *2-3 (D. Del. May 11, 1993).  In light of the consistent line of precedents holding that the willful loss of earnings rule, developed in the NLRA cases, applies in the employment discrimination context, and finding that the rule does not frustrate the purposes of the ADEA or PHRA, I conclude that it is applicable here.

A willful loss of earnings has been found where the alleged victim has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause.  See Sangster, 633 F.2d at 868. In this matter, the evidence, viewed in the light most favorable to Ms. Holocheck, supports only one conclusion: that she completely withdrew from the labor market.  Ms. Holocheck testified

that she has made no effort to obtain any substitute employment – either within or outside the field of teaching – since she was terminated by Head Start.  (Holocheck Dep., at 10, 12, 84-85.) She has not read through the classified ads to locate a job, nor has she made inquiries within her field.  (Id. at 84-85.)  In other words, since her termination, Ms. Holocheck has remained idle.  To be sure, Ms. Holocheck worked sporadically for a restaurant over a two to three month period in the summer of 2003.  (Id. at 9-10; 15.)  Yet, even here, Ms. Holocheck did nothing proactive to obtain the position.  (Id. at 15-16.)  Instead, a friend mentioned during a conversation the need for a temporary replacement, and Ms. Holocheck agreed to help out. (Id. at 16.)  It is significant, moreover, that before, during, and after her brief stint at Haystacks, Ms. Holocheck made no attempt to secure substitute employment.  This temporary period of employment "does not equate to a mitigation of damages because there is no evidence that it followed upon a diligent search for more permanent employment."  Greenway, 143 F.3d at 54.

Ms. Holocheck's situation is directly analogous to the discriminatees in Tubari, who accepted interim employment involving picketing activities without searching for substantially equivalent work.  The court in Tubari held that the discriminatees willfully incurred their earnings losses, thus dispensing with the need for the employer to produce evidence that substantially equivalent work was available.  Ms. Holocheck withdrew completely from the labor market.  As the Seventh Circuit observed in Hunter, "[y]ou cannot just leave the labor force after being wrongfully discharged, in the hope of someday being made whole by a judgment at law."  797

32

F.2d at 1428.

Ms. Holocheck argues that she was precluded from seeking another teaching position because any potential employer would have required a reference from Head Start, and she assumed the reference would be negative due to her termination and Defendants' characterization of her misconduct.  (Pl.'s Opp'n Mem., at 12-13.)  However, Ms. Holocheck never applied for any jobs and therefore has no personal knowledge that a prospective employer would require a reference from Head Start.  (Id. at 10-11.)  Moreover, she never requested a reference from Head Start and was never told by anyone from Head Start that a negative reference would be supplied to an inquiring employer.  (Id. at 11.)  To the contrary, Ms. Biga stated that Head Start has a neutral reference policy, and Ms. Holocheck has presented no evidence disputing this.  Ms. Holocheck's concern is simply an assumption having no support in the record, and Ms. Holocheck cannot rely on speculation to survive summary judgment.  Therefore, Ms. Holocheck cannot defeat summary judgment on this basis.

Ms. Holocheck asserts three other contentions, none of which is supported by the record.  First, she argues that Defendants have withheld her CDA credentials, despite her reasonable request for their return, and she cannot obtain a teaching position without them.  (Pl.'s Opp'n Mem., at 13.)  There is no evidence in the record that Defendants have withheld Ms. Holocheck's CDA credentials, and Ms. Holocheck's sole explanation for not attempting to secure substitute employment is her fear of a negative reference.  Thus, this is simply an

unsubstantiated contention on the part of her counsel that is insufficient to defeat summary judgment.  See Murphy v. Bitsoih, 320 F. Supp. 2d 1174, 1182 (D.N.M. 2004).  Moreover, the question is the plaintiff's availability for employment.  Defendants have shown that Ms. Holocheck withdrew completely from the labor force, and she has not presented competent evidence calling into question Defendants' evidence.

Second, Ms. Holocheck argues that testimony from Ms. Biga and Ms. Sod that Head Start is a unique program without a close equivalent is tantamount to a concession that there is no comparable employment available.  (Id.)  This contention is both irrelevant and lacks merit.  The field in which Ms. Holocheck was employed is early childhood education.  There is no evidence that Ms. Holocheck is only qualified to teach at a Head Start-like entity and nowhere else.

Third, Ms. Holocheck contends that Ms. Biga and Ms. Sod have publicly stated that Ms. Holochek "is not fit to work with children."  (Id.)  Once again, there is no foundation in the record for this assertion.  Other than the meeting of the Head Start Board of Directors, the unemployment compensation proceeding, and this case, there is no evidence of any statements by Ms. Biga, Ms. Sod, or any other individuals connected with Head Start that have vilified Ms. Holocheck or otherwise prejudiced her ability to secure substitute employment.

Au fond, Ms. Holocheck's deposition testimony establishes that she voluntarily quit the labor market when she was fired.  By not taking any steps to obtain any gainful employment,

she failed to mitigate her losses.  See Greenway, 143 F.3d at 54-55; Tubari, 959 F.2d 459;

Paluh v. HSBC Bank USA, 409 F. Supp. 2d 178, 204-05 (W.D.N.Y. 2006).

Where there is evidence that a victim of employment discrimination sought employment,

but may not have been diligent in doing so, justifying a failure to mitigate finding, a complete

ban on front pay is not necessarily warranted.  See Booker, 64 F.3d at 867-68 (rejecting a "no

mitigation – no back pay" rule).  In that circumstance, a fact-finder has before it evidence of the

efforts at finding substitute employment, and can make an assessment of when it was

reasonably likely that the plaintiff could have secured other work as well as the amounts she

was reasonably likely to earn in that alternative employment.  For example, in Booker, there

was evidence that there was alternative work available to the plaintiff, but it would have paid

less than what he had been earning.  Id. at 866-67.  Thus, there was an evidentiary foundation

for the conclusion that had the plaintiff "successfully mitigated his damages, he would still not

have been made 'whole' absent the award of some back pay."  Id. at 867.

Here, by way of contrast, Ms. Holocheck immediately exited the employment market.

Under Tubari, the question of comparable employment is irrelevant in the circumstances

presented here.  As recognized by the Second Circuit in Greenway, once the employee left the

employment market, the employer is "release[d] . . . from showing that comparable

compensation was available."  143 F.3d at 55.  If, however, the employee produces evidence

that comparable compensation was not available even had she sought alternative employment,

the possibility of a back pay award would remain.  Broadnax, 415 F.3d at 270; Greenway, 143 F.3d at 55.

Thus far, Ms. Holocheck has not done so here.  Her failure to produce such evidence ordinarily would warrant summary judgment in favor of Defendants.  As noted above, however, the late assertion of the mitigation defense arguably precluded Ms. Holocheck from presenting evidence that other early childhood teaching positions in the area paid less that Head Start.  Ms. Holocheck will be given the opportunity to present such evidence at trial.  If she fails to do so, a back pay award will be foreclosed.  See Greenway, 143 F.3d at 55.

It is clear, however, that the failure to mitigate does preclude any claim for front pay.  See Caufield, 133 Fed. Appx. at 11; Sellers, 902 F.2d at 1196; George v. Bethlehem Steel Corp., Civ. A. No. 91-64324, 1992 WL 131883, at *4-5 (E.D. Pa. June 5, 1992).  Accordingly, Defendants will be granted summary judgment on the claim for front pay.

### C. Other Grounds

Defendants seek summary judgment with respect to Ms. Holocheck's claim for emotional distress damages.  (Defs.' Supp. Mem., at 15.)  Because Ms. Holocheck is not requesting emotional distress or pain and suffering damages, (see Pl.'s Opp'n Mem., at 1 n.1), summary judgment will be granted.  Defendants also seek dismissal of Ms. Holocheck's PHRA claim because she cannot recover on her "federal claims."  (Defs.' Supp. Mem., at 16.)  Since Ms. Holocheck has a viable ADEA claim, summary judgment on this basis will be denied.

## III. **CONCLUSION**

For the reasons set forth herein, Defendants' motion for summary judgment is granted in part and denied in part.  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARY HOLOCHECK** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **3:CV-04-2082** |
| | : | **(JUDGE VANASKIE)** |
| **LUZERNE COUNTY HEAD START, INC.,** | : | |
| **LYNN EVANS BIGA, Individually and as** | : | |
| **Executive Director of Luzerne County** | : | |
| **Head Start, Inc., MARION SOD,** | : | |
| **Individually and as Manager of the** | : | |
| **Nanticoke and Plymouth Centers of** | : | |
| **Luzerne County Head Start, Inc.** | : | |
| **Defendants** | : | |

<u>**ORDER**</u>

**NOW, THIS 28th DAY OF MARCH, 2007,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Dkt. Entry 35) is **GRANTED IN PART**

**AND DENIED IN PART** as follows:

a) Defendants' motion with respect to their affirmative defense of failure to

mitigate damages is **GRANTED.**  Plaintiff is precluded from recovering front pay, and

any award of back pay will be reduced by the amounts Plaintiff could have earned in

comparable employment.

b) Defendants' motion with respect to Plaintiff's request for emotional distress

damages is **GRANTED.**

c) In all other respects, Defendants' motion is **DENIED.**

2. A telephonic scheduling conference will be conducted on **Thursday, April 5, 2007, at 1:30 p.m.**  Attorney Ralph E. Kates, III, is responsible for placing the call to **570-207-5720**, and all parties shall be ready to proceed before the undersigned is contacted.


**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge